## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF IOWA

| | | |
|---|---|---|
| MARY S. MUNDY, TRUSTEE U/A DTD 04/23/1987 MARY S MUNDY R/L TRUST II, individually and on behalf of all others similarly situated, | ) ) ) ) | |
| | ) | **CIVIL ACTION NO. _____** |
| Plaintiff, | ) ) | |
| | ) | **CLASS ACTION COMPLAINT** |
| v. | ) ) | |
| | ) | <u>**JURY TRIAL DEMANDED**</u> |
| STEPHEN LACY, D. MELL MEREDITH FRAZIER, DONALD A. BAER, DONALD C. BERG, MARY SUE COLEMAN, FREDERICK B. HENRY, JOEL JOHNSON, PHILIP A. MARINEAU, ELIZABETH TALLET, MEDIA GENERAL, INC., MONTAGE NEW HOLDCO, INC., MONTAGE MERGER SUB 1, INC., MONTAGE MERGER SUB 2, INC. and MEREDITH CORPORATION, | ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

Plaintiff Mary S. Mundy, Trustee U/A DTD 04/23/1987 Mary S Mundy R/L Trust II, ("Plaintiff"), by its attorneys, alleges upon information and belief, except for its own acts, which are alleged on knowledge, as follows:

### <u>SUMMARY OF THE ACTION</u>

1.      Plaintiff brings this action on behalf of all stockholders of Meredith Corporation ("Meredith" or the "Company") against defendants Meredith and its board of directors (the "Board" or the "Individual Defendants") and Media General, Inc., Montage New Holdco, Inc., Montage Merger Sub 1, Inc., and  Montage Merger Sub 2, Inc. (collectively, "Media General") (Meredith, the Board, and Media General are collectively referred to as "Defendants") seeking equitable relief for Defendants' breaches of fiduciary duties and other violations of state law

arising out of Media General's proposed acquisition of Meredith (the "Proposed Transaction"). Under the terms of the Proposed Transaction, Media General intends to purchase all of the outstanding shares of Meredith in a stock and cash transaction worth approximately $2.4 billion, whereby each Meredith stockholder is to receive 1.5214 shares of Media General common stock and $34.57 in cash for each share of Meredith they own.  Based on the closing price of Media General common stock on September 4, 2015, the last trading day before the Proposed Transaction was announced, this implies a per share consideration of approximately $51.53 (the "Merger Consideration").

2.      The Proposed Transaction was approved by a majority-interested Board who stood to profit from windfall financial benefits from change of control payments and cashing out their equity interests, as well as lucrative post-deal employment positions with the merged entity. Specifically, as part of the terms of the transaction, four Meredith Board members will continue on as directors of the new company and defendant Stephen M. Lacy ("Lacy"), President, Chief Executive Officer ("CEO"), and Chairman of the Board, will serve as President and CEO of the new company.

3.      Moreover, defendant D. Mell Meredith Frazier ("Frazier") controls 63% of the Company's Class B shares and 8.75% of the Company's common stock, equating to approximately 44% of the overall voting power.  As a result, Defendant Frazier is a controlling stockholder of the Company and owes Plaintiff and Meredith's other public stockholders the highest obligations of loyalty, good faith, fair dealing, due care, and full and fair disclosure. Notwithstanding, Defendant Frazier has executed certain support agreements to vote her substantial block in favor of the Proposed Transaction, thereby depriving Meredith stockholders of any meaningful opportunity to oppose the merger outside of this litigation.

4.      Accordingly, six members of Meredith's nine-member Board are conflicted as a result of their continued employment with the combined company after the Proposed Transaction closes and/or voting control.

5.      To ensure the Company was sold to Media General and only Media General, the Board retained a conflicted financial advisor, Moelis & Company LLC ("Moelis"), to opine that the Merger Consideration is fair.  Moelis has provided services for Media General on numerous occasions in recent years amounting to a material amount of revenue from fees earned.

6.      Motivated by their personal interests in guaranteed post-merger employment, the Individual Defendants favored a deal with Media General no matter the cost to the Company's minority public stockholders.  Moelis was happy to oblige the Board's plan, motivated by its own interests in continuing to receive future business from Media General.

7.      As a result, the Individual Defendants agreed to inadequate Merger Consideration that undervalues the Company.  The Merger Consideration represents virtually no premium for Meredith's stock in this change-of-control transaction, which reached intraday trading prices equal to or above the Merger Consideration on no less than 164 trading days between October 2014 and October 2015, alone.  Moreover, Meredith's stock price reached a year-to-date intraday high of $57.22 per share as recently as March 20, 2015.  The Merger Consideration is also significantly lower than analysts' estimated value of $58.00 per share.

8.      Due to the fact that a majority of the Board is conflicted in this deal, it had a duty to ensure that both the process leading up to the merger and the Merger Consideration were entirely fair to the Company's stockholders – an impossible task at which they failed given the inherent conflicts of interest predominating them.

9.      To secure their financial and employment benefits, the Individual Defendants

further exacerbated their breaches of fiduciary duties by agreeing to certain deal protection devices in the Merger Agreement that will prevent other bidders from making successful competing offers, including:

- a termination fee provision whereby the Board agreed that Meredith would pay Medial General a termination fee of up to $60 million if it terminates the Proposed Transaction;

- a strict no-solicitation provision that effectively precludes the Board from attempting to maximize stockholder value by soliciting bids from any other potential acquirers and requires that the Board cease existing communications and negotiations after a certain time;

- an information rights and matching rights provision that requires the Company to notify Media General of certain unsolicited competing offers, provide Media General with information regarding such offers, and negotiate in good faith with Media General regarding the same; and

- several support agreements, pursuant to which Meredith family members collectively owning 63% of the Company's Class B shares are locked-up in favor of the Proposed Transaction.

These provisions substantially and improperly limit the Board's ability to investigate and pursue superior proposals and alternatives and virtually guarantee the consummation of the Proposed Transaction.

10.    In sum, Defendants failed to maximize stockholder value and to protect the interests of Meredith's stockholders.  Instead, Defendants engaged in a process that was designed to benefit Media General and secure material personal benefits for themselves.  Each of the

Individual Defendants has breached his or her fiduciary duties and/or has aided and abetted such breaches by favoring Media General's or his/her own financial interests over those of Meredith and its public, non-insider stockholders.  As a result, Plaintiff and the other public stockholders are receiving an unfair price in the Proposed Transaction and lack the necessary and material information to consider it.

11.     For these reasons and as set forth in detail herein, Plaintiff seeks to enjoin the Proposed Transaction, or, in the event the Proposed Transaction is consummated, recover damages resulting from the Individual Defendants' violations of their fiduciary duties, and from the other Defendants for aiding and abetting same.

## JURISDICTION

12.     This Court has jurisdiction pursuant to 28 U.S.C. § 1332(d) ("The Class Action Fairness Act") because sufficient diversity of citizenship exists between parties in this action, the aggregate amount in controversy exceeds $5,000,000, and there are 100 or more members of the Class (defined herein).

13.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1391 (b)-(d), because a substantial part of the events giving rise to Plaintiff's claims occurred in this District and one or more of the Defendants are licensed to do business in, are doing business in, had agents in, or are found or transact business in Iowa and this District.

## PARTIES

14.     Plaintiff is, and has been at all relevant times, the owner of shares of common stock of Meredith.  Plaintiff is a resident of Mt. Carmel, Illinois.

15.     Defendant Meredith is an Iowa corporation with its principal place of business located at 1716 Locust Street, Des Moines, Iowa 50309-3023.  The Company is traded on the New York Stock Exchange under the ticker symbol "MDP."

16.     Defendant Lacy is the President and CEO of Meredith and Chairman of the Board. Lacy joined Meredith in 1998 as Vice President and CFO, and was appointed President and CEO on February 1, 2010.  Pursuant to the terms of the merger agreement, defendant Lacy will be appointed President and CEO of the post-transaction entity.  Upon information and belief, Defendant Lacy is resident of Des Moines, Iowa.

17.     Defendant Frazier is Vice Chairperson of the Board.  Frazier is also Chairperson of the Nominating/Governance Committee and a member of the Compensation Committee.  In addition, Frazier serves as Chairperson of the Board of the Meredith Corporation Foundation, and is a fourth-generation member of the Meredith family.  Frazier and her brother E.T. (Tom) Meredith IV, who together beneficially own 63% of the Meredith Class B shares and 8.75% of the Meredith Common Stock, have agreed to vote in favor of the Proposed Transaction.  Upon information and belief, defendant Frazier is a resident of Des Moines, Iowa.

18.     Defendant Donald A. Baer ("Baer") has been a Director of the Board since 2014. Baer is also a member of the Audit Committee and the Finance Committee.  Upon information and belief, defendant Baer is a resident of Washington, D.C.

19.     Defendant Donald C. Berg ("Berg") has been a Director of the Board since 2012. Berg is also a member of the Audit Committee and the Finance Committee.  Upon information and belief, defendant Berg is a resident of Prospect, Kentucky.

20.     Defendant Mary Sue Coleman ("Coleman") has been a Director of the Board since 1997.  Coleman is also a member of the Audit Committee and the Finance Committee. Upon information and belief, defendant Coleman is a resident of Ann Arbor, Michigan.

21.     Defendant Frederick B. Henry ("Henry") is a Director of the Board.  Henry is also the Chairman of the Compensation Committee and a member of the Nominating/Governance Committee.  Upon information and belief, defendant Henry is a resident of Aspen, Colorado.

22.     Defendant Joel Johnson ("Johnson") is a Director of the Board.  Johnson is also the Chairman of the Finance Committee and a member of the Nominating/Governance Committee.  Johnson retired as Chairman of the Board of Hormel Foods Corporation ("Hormel") in December 2006, where Defendant Lacy currently serves as Chairman of the Compensation Committee and a member of the Audit Committee.   Upon information and belief, defendant Johnson is a resident of Scottsdale, Arizona.

23.     Defendant Philip A. Marineau ("Marineau") has been a Director of the Board since 1997.  Marineau is also the Chairman of the Audit Committee and a member of the Compensation Committee.  Upon information and belief, defendant Marineau is a resident of San Francisco, California.

24.     Defendant Elizabeth Tallett ("Tallett") has been a Director of the Board since 2008.  Tallett is also a member of the Nominating/Governance Committee and the Compensation Committee.   Upon information and belief, defendant Tallett is a resident of Stockton, New Jersey.

25.     Defendant Media General is a Virginia corporation with its principal place of business at 333 E. Franklin Street, Richmond, Virginia 23219.  Media General is one of the nation's largest multimedia companies and operates or services 71 television stations in 48

markets along with the industry's leading digital media business. The company's portfolio of broadcast, digital and mobile products informs and engages 23% of U.S. TV households and 43% of the U.S. Internet audience.

26.     Defendant Montage New Holdco, Inc. is a Virginia corporation wholly owned by Media General and created for the purposes of effectuating the Proposed Transaction.

27.     Defendant Montage Merger Sub 1, Inc. is a Virginia corporation wholly owned by Montage New Holdco, Inc. and created for the purposes of effectuating the Proposed Transaction.

28.     Defendant Montage Merger Sub 2, Inc. is an Iowa corporation wholly owned by Montage New Holdco, Inc. and created for the purposes of effectuating the Proposed Transaction.

## THE INDIVIDUAL DEFENDANTS' FIDUCIARY DUTIES

29.     By reason of the Individual Defendants' positions with the Company as officers and/or directors, they are in a fiduciary relationship with Plaintiff, the Company, and the public stockholders of Meredith and owe them the highest duty of good faith, fair dealing, loyalty and full, candid and adequate disclosure.

30.     In addition where, as here, a majority of the Board stands on both sides of a transaction, or alternatively, a majority of the Board is inherently conflicted, the directors must ensure that the transaction is entirely fair to stockholders. In connection with the Proposed Transaction, the Board had an affirmative fiduciary obligation to conduct a fair process and obtain a fair price for the Company's stockholders.

31.     To diligently comply with their fiduciary duties, the Individual Defendants, as Directors and/or officers of Meredith, are obligated to refrain from:

    (a)     participating in any transaction where the directors or officers' loyalties are divided;

    (b)     participating in any transaction where the directors or officers receive, or are entitled to receive, a personal financial benefit not equally shared by the public stockholders of the corporation; and/or

    (c)     unjustly enriching themselves at the expense or to the detriment of the Company and its public stockholders.

32.    Here, as a majority of Meredith's Board is conflicted by the promise of post-transaction employment and/or voting control, and thus essentially stands on both sides of the transaction, they are obligated to ensure, and to show, that the Proposed Transaction is entirely fair to Meredith stockholders.  Five of the nine Meredith Board members will continue their employment in the post-transaction entity following the merger, and the Company's controlling stockholder/director has agreed to vote her substantial block in favor of the Proposed Transaction.  In light of their conflicts, it was impossible for these six director defendants to fulfill their fiduciary duties to Meredith's stockholders.

33.    Plaintiff alleges herein that the Individual Defendants, separately and together, in connection with the Proposed Transaction are knowingly or recklessly violating their fiduciary duties, including their duties of loyalty, good faith and independence owed to the Company and derivatively to Plaintiff and other public stockholders of Meredith, or are aiding and abetting others in violating those duties.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

34.    In committing the wrongful acts alleged herein, each of the Defendants has pursued, or joined in the pursuit of, a common course of conduct, and acted in concert with and

conspired with one another, in furtherance of their common plan or design.  In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Defendants further aided and abetted and/or assisted each other in breach of their respective duties as herein alleged.

35.     During all relevant times hereto, the Defendants, and each of them, initiated a course of conduct which was designed to and did: (i) permit Media General to attempt to eliminate the public stockholders' equity interest in Meredith pursuant to a defective sales process, and (ii) permit Media General to buy the Company for an unfair price.  In furtherance of this plan, conspiracy and course of conduct, Defendants, and each of them, took the actions as set forth herein.

36.     Each of the Defendants herein aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions, as particularized herein, to substantially assist the commission of the wrongdoing complained of, each Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to, and furtherance of, the wrongdoing.  The Defendants' acts of aiding and abetting included, *inter alia*, the acts each of them are alleged to have committed in furtherance of the conspiracy, common enterprise and common course of conduct complained of herein.

## CLASS ACTION ALLEGATIONS

37.     Pursuant to Federal Rule of Civil Procedure 23, Plaintiff brings this action on their own behalf and as a class action on behalf of all owners of Meredith common stock and their successors in interest, except Defendants and their affiliates (the "Class").

38.     This action is properly maintainable as a class action for the following reasons:

(a)     the Class is so numerous that joinder of all members is impracticable.  As of July 31, 2015, Meredith has approximately 36.66 million common shares and 6.96 million Class B shares outstanding.

(b)     questions of law and fact are common to the Class, including, inter alia, the following:

    (i)     Whether the Individual Defendants breached their fiduciary duties owed by them to Plaintiff and the others members of the Class;

    (ii)     Whether the Individual Defendants, in connection with the Proposed Transaction of Meredith by Media General, are pursuing a course of conduct that is in violation of their fiduciary duties;

    (iii)     Whether Meredith and Media General aided and abetted the Individual Defendants' breaches of fiduciary duty; and

    (iv)     Whether the Class is entitled to injunctive relief or damages as a result of Defendants' wrongful conduct.

(c)     Plaintiff is committed to prosecuting this action and have retained competent counsel experienced in litigation of this nature.

(d)     Plaintiff's claims are typical of those of the other members of the Class.

(e)     Plaintiff has no interests that are adverse to the Class.

(f)     The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications for individual members of the Class and of establishing incompatible standards of conduct for Defendants.

(g)     Conflicting adjudications for individual members of the Class might as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

## SUBSTANTIVE ALLEGATIONS

### *Company Background and Poise for Growth*

39.     Meredith is an American media conglomerate based in Des Moines, Iowa, originally founded by Edwin Thomas Meredith in 1902.  The Company went public in 1946 and was first listed on the New York Stock Exchange in 1965. Following its initial public offering, Meredith began acquiring television stations, a strategy it has continued over the decades. Recently, Meredith has introduced numerous other female-oriented consumer brands and has expanded its reach, through acquisitions and strategic partnerships, to become the leading media and marketing company serving the adult female audience in the United States.

40.     The Company operates in two business segments: national media and local media. The national media segment includes magazine publishing, brand licensing, digital and customer relationship marketing, digital and mobile media, database-related activities, and other related operations. The local media segment consists of the operations of network-affiliated television stations, related digital and mobile media, and video creation operations.

41.     Under the terms of the Proposed Transaction, Meredith stockholders will receive 1.5214 shares of Media General common stock and $34.57 per share in cash in exchange for each share of Meredith they own.  Based on the closing price of Media General on September 4, 2015, the transaction values Meredith shares at approximately $51.53 per share.

42.     Meredith has consistently traded above the Merger Consideration on at least 164 days between October 2014 and October 2015, alone.  During this time, the Company reached a

year-to-date intraday high of $57.22 per share on March 20, 2015, and most recently traded above the Merger Consideration on July 23, 2015 when the stock reached an intraday trading high of $51.88.  The Merger Consideration is also significantly lower than analyst estimates, including a price target of $55.00 per share by Jefferies on July 21, 2015, and $58.00 per share by *Yahoo!* Finance.  As of September 26, 2015, the average 1 year price target among analysts that have updated their coverage on the stock in the last year is $54.00 per share.

43.     As reflected in these recent price targets, the Company's recent filings and press releases indicate that Meredith is poised for extraordinary growth.

(a)     In a press release concerning the Company's most recent fourth-quarter and full-year 2015 results, reported on July 30, 2015, Defendant Lacy stated that "Fiscal 2015 was a year of strong growth in revenues, profit and cash flow," explaining that the Company had aggressively added to its portfolio, including acquiring great local television stations, powerful national brands, and cutting-edge digital properties.   This strategy in turn resulted in the Company's Local Media Group delivering "the best financial performance in its over 65-year history, and [the] National Media Group set[ting] records in digital advertising and brand licensing revenues."  *See* Form 8-K (Jul. 30, 2015).

(b)     In a press release concerning the Company's third-quarter 2015 results, Defendant Lacy stated that the Company "deliver[ed] solid third-quarter results, including record digital performance, while aggressively integrating the newly-acquired Shape brand and our other recent portfolio additions."  For this quarter, the Company reported that the Local Media

Group revenues increased 26 percent to $123 million, an all-time high for a fiscal third quarter; operating profit excluding special items and adjusted EBITDA grew to $32 million and $42 million, respectively; National Media Group revenues increased, led by 5 percent growth in advertising revenues; and Total Company digital advertising revenues grew more than 55 percent, driven by recent acquisitions and organic growth. *See* Form 8-K (Apr. 23, 2015).

(c)    In a press release concerning the Company's second-quarter 2015 results, the Company reported earnings per share grew 45 percent to a second quarter record of $1.00, compared to $0.69 in the prior-year period, and operating profit margin increased nearly five percentage points to 20 percent. In addition, Local Media Group revenues increased 50 percent to an all-time quarterly record of $157 million; operating profit and EBITDA also set records, growing more than 60 percent each to $60 million and $70 million, respectively; and National Media Group operating profit grew 7 percent and margin strengthened, driven by increased advertising revenues - including record fiscal second quarter digital advertising performance. *See* Form 8-K (Jan. 28, 2015).

(d)    Finally, in a press release concerning the Company's first-quarter 2015 results, Defendant Lacy stated, "Fiscal 2015 is off to a solid start. We're encouraged by improving advertising trends, particularly in the digital sector, and the strong performance of our recent acquisitions. In addition, our brands continue to resonate extremely well with consumers across our

media platforms and at retail." The Company further reported that Local Media Group revenues increased nearly 40 percent to a fiscal first quarter record of $125 million; operating profit and EBITDA also set fiscal first quarter records, growing approximately 40 percent each to $36 million and $45 million, respectively; and National Media Group operating profit and margin strengthened, driven by record fiscal first quarter digital advertising and brand licensing revenues.

(e) Also for the first-quarter 2015, the Company announced that on October 15, 2014, Meredith had entered into an agreement to acquire the rights to Martha Stewart Living and Martha Stewart Weddings magazines and the www.marthastewart.com and www.marthastewartweddings.com, effective November 1, 2014.

44. In addition to its strong financial performance, the Company is also continually expanding. In recent transactions, Meredith has extended its media and marketing platform around the globe, through acquisitions and strategic licensing relationships.

45. In 2005, Meredith acquired the *Parents*, *Family Circle*, and *Fitness* brands from European media conglomerate, Bertelsmann. In March 2012, Meredith completed the acquisition of allrecipes.com from Reader's Digest Association for $175 million. In October 2014, Meredith announced a 10-year licensing agreement with Martha Stewart Living Omnimedia to acquire the rights to *Martha Stewart Living*, *Martha Stewart Weddings* and *marthastewart.com*; and in November 2014, a month after inking the licensing deal with Martha Stewart Living Omnimedia, Meredith acquired *mywedding.com*.

46.     Most recently, in June 2015, the Company acquired *Qponix*, a leading shopper marketing data platform technology, further expanding Meredith's digital shopper marketing capabilities. This platform allows advertisers to deliver to consumers product offers at the exact moment they are developing weekly shopping lists or in the grocery aisle.  Also during fiscal 2015, Meredith continued to expand its reach to the consumer by increasing the rate base of *Allrecipes* magazine to 1.1 million, more than doubling its size at launch in November 2013. Meredith also grew the rate base of *EatingWell* magazine to 1.0 million, up from 350,000 when acquired four years ago. In addition, the Company launched *Parents Latina* magazine, a new brand aimed at the U.S. Hispanic millennial woman, and the *Eat This!Not That!* bookazine based on the popular brand of the same name.

47.     As reflected in these quotes and in the Company's recent financial results and concurrent press releases and statements, showing the Company's continual expansion, Meredith has made significant growth in its industry and is expected to continue to yield returns for the Company and its stockholders well into the future.

48.     Moreover, the Proposed Transaction represents significant added synergies for Media General.  Media General operates 71 television stations across 48 markets and boasts the "largest and most diverse digital media business with a growing portfolio," according to the company's website. Meredith is a multiplatform company that distributes content through broadcast television, print, digital, mobile, and video. Uniting the two companies will provide Media General with a much broader reach, as the post-transaction entity will be the nation's third-largest owner of local television stations in the U.S.  In addition, the merged company expects about $80 million in cost savings achieved through combining overlapping functions and other efficiencies.  J. Stewart Bryan III, Media General chairman, commented on the deal:

This merger creates greater opportunities for profitable growth than either company could achieve on its own. Importantly, shareholders of both companies will benefit from the upside potential of a diversified and strategically well-positioned media company with a strong financial profile and the ability to generate significant free cash flow.

49.    However, despite the Company's financial strength and position as premier player in its industry, the Individual Defendants have entered into the Merger Agreement with Media General, depriving the Plaintiff and the minority public stockholders of the Company the full opportunity to participate in the growth of the Company they have loyally invested in.

***The Proposed Transaction***

50.    In a press release dated September 8, 2015, the Company announced that it had entered into a merger agreement with Media General, stating:

> Media General, Inc. (NYSE: MEG; www.mediageneral.com) and Meredith Corporation (NYSE: MDP; www.meredith.com) announced today a definitive merger agreement under which Media General will acquire all of the outstanding common stock of Meredith in a cash and stock transaction currently valued at approximately $2.4 billion to create a powerful new multiplatform and diversified media company to be known as Meredith Media General.

> Under the terms of the agreement, Meredith shareholders will receive cash and stock valued at $51.53 per share, which represents a 12 percent premium to Meredith's closing stock price on September 4, 2015. Both classes of Meredith stock, Common Stock and Class B Common Stock, will receive the same consideration per share. Based on Meredith's net debt balance of $772 million at June 30, 2015, the transaction enterprise value is approximately $3.1 billion.

> Media General has formed a new holding company, which after closing will be named Meredith Media General. Media General shareholders will receive one share of the new holding company for each share of Media General they own upon closing. Meredith shareholders will receive $34.57 in cash and 1.5214 shares of the new holding company for each share of Meredith they own upon closing. Upon the closing of the transaction, Media General shareholders will own approximately 65 percent and Meredith shareholders will own approximately 35 percent of the fully-diluted shares of Meredith Media General.

Upon the closing, the Board of Directors will consist of 12 directors, eight appointed by Media General and four appointed by Meredith. J. Stewart Bryan III, current Media General Chairman, will be Chairman of Meredith Media General.

Stephen M. Lacy will lead Meredith Media General as Chief Executive Officer and President. Joseph H. Ceryanec will be the Chief Financial Officer. The balance of Meredith Media General's senior management team will be a combination of the two existing executive teams. The company will maintain corporate and executive offices in Des Moines and Richmond. Meredith Media General will be incorporated in Virginia.

Meredith Media General will be well positioned to grow in a rapidly consolidating and evolving media industry. It will use its strong financial profile to deliver substantial value to shareholders, customers and employees. This financial profile includes:

- Pro-forma annual revenues of $3 billion and EBITDA of over $900 million;
- More than $80 million of total synergies expected within the first two years with $60 million of run-rate synergies expected in the first 12 months of operations post-closing;
- Significant free cash flow that can be used to rapidly pay-down debt;
- Expected pro forma net leverage at closing of less than 5.5x, based on 2014/2015 average pro forma adjusted EBITDA, as per Media General's credit agreement;
- Consistent with Meredith's long history of Total Shareholder Return, a strong commitment to returning cash to shareholders via dividends over the longer term; and
- The opportunity to continue growing and expanding its portfolio on the national and local level as the media industry consolidates.

*** 

Meredith Media General will boast a portfolio of best-in-class media platforms including:

- Third-largest local television station owner, initially with 88 television stations across 54 markets that reach 30 percent – or approximately 34 million – U.S. TV households. It will include 40 Big Four network-affiliated TV stations located in the Top 75 DMAs. Stations in six markets will be swapped or otherwise divested in order to address regulatory considerations. These markets are Portland, OR; Nashville, TN; Hartford-New Haven, CT; Greenville-Spartanburg, SC-Asheville, NC; Mobile, AL-Pensacola, FL; and Springfield, MA. To the extent that the company is able to successfully execute swaps, as opposed to

outright sales, it will further enhance the combined company's size and scale.  Moelis & Company has been retained to manage the process of divesting stations in overlapping markets to facilitate regulatory approval.

- Leading multiplatform national media brands with a top female reach of 100 million unduplicated American women and over 60 percent of U.S. Millennial women.  These category leading brands include Better Homes and Gardens, Allrecipes, Parents and Shape.

- A powerful digital platform reaching over 200 million monthly unique visitors via a combination of leading national and local consumer sites and business-to-business digital capabilities in key growth sectors such as content, mobile, social, video, and native advertising. Digital revenues are expected to exceed $500 million in the first full year of operations post-closing.

- Diverse revenue streams including a Top 3 global brand licensing program and leading marketing services agencies.

***

51.     Given the Company's recent performance and future prospects, the consideration stockholders are to receive is inadequate. Accordingly, Media General is picking up Meredith at the most opportune time, at a time when Meredith is poised for growth and the Proposed Transaction now acts as nothing more than an artificial ceiling to that continued growth.

***The Preclusive Deal Protection Devices***

52.     In addition, on September 9, 2015 the Company filed a Form 8-K with the United States Securities and Exchange Commission ("SEC") wherein it disclosed the operating Agreement and Plan of Merger for the Proposed Transaction (the "Merger Agreement").  As part of the Merger Agreement, Defendants agreed to certain onerous and preclusive deal protection measures that operate conjunctively to make the Proposed Transaction a *fait accompli* and ensure that no competing offers will emerge.

53.     First, Sections 6.10 and 6.11 of the Merger Agreement contain a "standstill" provision which requires the Company, and any of its agents or representatives, "to immediately cease and cause to be terminated any existing activities, discussions or negotiations" with any

19

other potential acquirer.   Moreover, these sections contain a strict "no shop" provision prohibiting the members of the Meredith Board from soliciting proposals relating to alternative acquisition proposals or business combinations which may increase stockholder value.   This prohibition even prevents the Company from sharing information which might lead to a competing offer.

54.   Meredith may entertain a competing proposal *only* if the Company receives a bona fide, written proposal which the Board determines in good faith, after consulting with an independent financial advisor and outside legal counsel, is reasonably likely to result in terms that are more favorable from a financial point of view to Meredith's stockholders and is reasonably capable of being consummated.   However, Meredith must notify Media General of any competing offer, including the terms thereof and the identity of the offeror, which will deter any party from going through the trouble of making a competing offer.

55.   Moreover, in the event that the Board deems the competing offer to be superior to the agreement struck with Media General, Meredith must provide Media General with notice that the competing offer constitutes a superior competing transaction, whereupon Media General will have four business-days to negotiate changes which would render the once "superior" competing offer no longer superior. These provisions further discourage bidders from making a competing bid for the Company.

56.   In addition to the "no shop" and "standstill" provisions, the Merger Agreement includes a $60 million termination fee should the Board choose to accept a superior deal *at any time within twelve months after the termination of the Merger Agreement, payable within two business-days*.   This provision all but guarantees that the Proposed Transaction will be

consummated notwithstanding that the Company will be sold to Media General for an inadequate price.

57.     Thus, even if the Meredith Board receives an intervening bid that appears to be superior to Media General's offer, the Board is functionally precluded from exercising its fiduciary duties and maximizing stockholder value.

**_The Conflicts of Interest Pervading the Proposed Transaction_**

58.     Despite their duty to maximize stockholder value, the defendants have clear and material conflicts of interest and are acting to better their own interests at the expense of Meredith's public stockholders.

59.     As an initial matter, a majority of the nine-person Board is conflicted by the prospect of post-transaction employment.  Under the terms of the merger agreement, Defendant Lacy will lead Meredith Media General, the post-transaction entity, as CEO and President.  In addition, the balance of Meredith Media General's senior management team will be a combination of the two existing executive teams.  Upon the closing of the Proposed Transaction, the board will consist of 12 directors, eight appointed by Media General and four appointed by Meredith.

60.     Defendant Frazier is also conflicted, as a fourth-generation member of the Meredith family and party to certain support agreements in favor of the Proposed Transaction. Specifically, Defendant Frazier and her brother, who together beneficially own 63 percent of the Meredith Class B shares and 8.75 percent of the Meredith Common Stock, have agreed to vote in favor of the Proposed Transaction. Frazier therefore possess approximately 44% of the Company's outstanding voting power, which has been unfairly tied up in favor of the Proposed Transaction.

61.     The Company is further conflicted in that it previously purchased various television station assets from Media General in late 2014.   In late 2014, Media General announced its acquisition of LIN Media for $1.6 billion.   To win government approval for the deal, the companies agreed to sell 7 television stations in 5 markets.   Media General ultimately sold WALA-TV, Mobile, Alabama to Meredith for $86 million.   The sale was completed on December 19, 2014, only ten months before the merger announcement.

62.     Finally, the Company's financial advisor in the Proposed Transaction, Moelis & Company LLC ("Moelis") is equally conflicted, having provided services for Media General on numerous occasions in recent years.   For example, in August 2014, Media General announced plans to divest television stations in certain markets in anticipation of its combination with LIN Media LLC.   Moelis acted as the exclusive financial advisor to Media General in connection with the divestitures and acquisitions.   In June 2013, Sinclair Broadcast Group, Inc. announced that it had entered into an agreement to sell the assets of WHTM-TV (ABC) in Harrisburg, PA to Media General. Moelis served as Sinclair's exclusive financial advisor in connection with the sale of WHTM-TV.   And lastly, Media General board member Diana Cantor is the spouse of Moelis' vice chairman and managing director, Eric Cantor.

63.     As a result of the above material conflicts of interest, a majority of the nine-member Board (at least six of nine directors) was incapable of exercising its own independent business judgment and acting in the best interests of Meredith's public stockholders. Furthermore, due to their majority conflicts, the Board is legally obligated to prove the entire fairness of the Proposed Transaction to Meredith stockholders.

64.     Accordingly, Plaintiff seeks injunctive and other equitable relief to prevent the irreparable injury that Company stockholders will continue to suffer absent judicial intervention.

### CLAIMS FOR RELIEF

### COUNT I
### Breach of Fiduciary Duty
### (Against the Individual Defendants)

65.     Plaintiff repeats all previous allegations as if set forth in fill herein.

66.     As Directors of Meredith, the Individual Defendants stand in a fiduciary relationship to Plaintiff and the other public stockholders of the Company and owe them the highest fiduciary obligations of loyalty and care.

67.     As discussed herein, the Individual Defendants have breached their fiduciary duties to Meredith stockholders by failing to engage in an honest and fair sale process.

68.     As a result of the Individual Defendants' breaches of their fiduciary duties, Plaintiff and the Class will suffer irreparable injury in that they have not and will not receive their fair portion of the value of Meredith's assets.

69.     Unless enjoined by this Court, the Individual Defendants will continue to breach their fiduciary duties owed to Plaintiff and the Class, and may consummate the Proposed Transaction, to the irreparable harm of the Class.

70.     Plaintiff and the Class have no adequate remedy at law.

### COUNT II
### Aiding and Abetting
### (Against Meredith and Media General)

71.     Plaintiff repeats all previous allegations as if set forth in full herein.

72.     As alleged in more detail above, Media General is well aware that the Individual Defendants have breached their fiduciary duties.  Defendants Media General aided and abetted the Individual Defendants' breaches of fiduciary duties.

73.     As a result, Meredith, Plaintiff and the Class are being harmed.

74.     Plaintiff and the Class have no adequate remedy at law.

**WHEREFORE**, Plaintiff demands judgment against Defendants jointly and severally, as follows:

(A)     declaring this action to be a class action and certifying Plaintiff as the Class representatives and her counsel as Class counsel;

(B)     enjoining, preliminarily and permanently, the Proposed Transaction;

(C)     in the event that the transaction is consummated prior to the entry of this Court's final judgment, rescinding it or awarding Plaintiff and the Class rescissory damages;

(D)     directing that Defendants account to Plaintiff and the other members of the Class for all damages caused by them and account for all profits and any special benefits obtained as a result of their breaches of their fiduciary duties;

(E)     awarding Plaintiff the costs of this action, including a reasonable allowance for the fees and expenses of Plaintiff's attorneys and experts; and

(F)     granting Plaintiff and the other members of the Class such further relief as the Court deems just and proper.

Respectfully Submitted


/s/ Kim K. Baer_____
Kimberley K. Baer  AT0000683
BAER LAW OFFICE
838 Fifth Avenue
Des Moines, Iowa 50309
Telephone: 515-279-2000
Facsimile: 515-279-2137
kbaer@baerlawoffice.com
ATTORNEYS FOR PLAINTIFFS
Local Counsel